IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| DAVID L. SHAW, #689847 | § | |
| VS. | § | CIVIL ACTION NO. 6:07cv443 |
| KAREN NORMAN, ET AL. | § | |

<u>MEMORANDUM OPINION AND</u>
<u>ORDER OF PARTIAL DISMISSAL</u>

Plaintiff David L. Shaw, a prisoner previously confined at the Beto Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. § 1983. The complaint was referred to the undersigned by consent of the parties pursuant to 28 U.S.C. § 636(c).

<u>Plaintiff's Allegations</u>

The original complaint was filed on September 17, 2007. The Plaintiff complained about the destruction of his property, including legal and religious property. He also complained about Chaplain Kiser removing him from the Ramadan list. On April 4, 2008, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), to consider the Plaintiff's claims. The Plaintiff testified that Officer Black inventoried his property on January 2, 2006. She did not confiscate any of his property. On June 29, 2006, Officers Karen Norman and Sherri Milligan confiscated significant portions of his property during another search. They took his legal papers. They took religious items, including his Koran, prayer rug and beads. He testified that they confiscated pictures of his family, including members of his family who had recently died. The property was subsequently destroyed. He noted that the pictures were the only items he had left to remind him of his family. His added that the only comfort he has in prison is his religion, and his religious items were taken. He testified that he could not say his prayers without his prayer rug and beads. He reiterated that Chaplain Kiser removed him from the Ramadan list.

All of this made him depressed and lose focus. He was sent to a psychiatric unit for 45 days and eventually transferred to the Clements Unit.

The Plaintiff testified that Property Officers Karen Norman and Sherri Milligan were the ones who actually confiscated his property. At the time of the search, he was the last inmate among several inmates to show up with his property. He noted that he had collected a lot of property over fifteen years in prison. Norman and Milligan became angry at him for being slow, thus they just took his property. An inmate at the Bill Clements Unit gave him another copy of the Koran, but he had to go without it for about four months. Warden Sloan testified under oath that Muslim inmates are normally permitted to have a copy of the Koran and a prayer rug.

At the conclusion of the hearing, the Plaintiff was permitted to proceed with the claims against Karen Norman, Sherri Milligan and Chaplain Charles Kiser concerning the denial of his religious rights as protected by the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

## Defendants' Motion for Summary Judgment

The Defendants filed a motion for summary judgment (docket entry #47) on August 28, 2008. They argued that they are entitled to summary judgment based on qualified and Eleventh Amendment immunity. In support of their motion, they submitted relevant grievance records, relevant property records and an affidavit from Chaplain Kiser.

The Defendants asserted that the facts are not in dispute that the Plaintiff is in the custody of the Texas prison system and that some of his religious property was confiscated. The Defendants noted that the constitutional protections afforded to inmates under the Free Exercise Clause are considerably limited by the reality of incarceration and the conflict posed by legitimate penological objectives. *Pell v. Procunier*, 417 U.S., 821-22 (1974). The limitations on the exercise of constitutional rights arise from both the fact of incarceration and from valid penological objectives, including deterrence of crime, rehabilitation of prisoners and institutional security. *Id.*

The Defendants noted that in *O'Lone v. Estate of Shabazz*, 482 U.S. 382 (1987), prison inmates and members of the Islamic faith brought suit under 42 U.S.C. § 1983, contending that policies adopted by New Jersey prison officials prevented them from attending Jumu'ah, a Muslim congregational service held on Friday afternoons, and thereby violated their rights under the Free Exercise Clause of the First Amendment. Those policies required certain categories of inmates to work outside the buildings in which they were housed and in which Jumu'ah was held, and prohibited inmates assigned to that outside work detail from returning to the building during the day to attend worship services.

The Defendants noted that the Supreme Court adopted the standard announced in *Turner v. Safley*[1] for evaluating prisoner challenges under the First Amendment's Free Exercise Clause. *Id.* at 349-50. Several factors were noted as relevant to a finding of whether a regulation was reasonable: (1) whether there is a valid, rational connection between the regulation and the legitimate, neutral governmental interest used to justify it; (2) whether there exist alternative means for prisoners to exercise the constitutional right at issue; (3) the impact of an accommodation on prison staff, inmates, and allocation of prison resources; and (4) whether any alternative exists that would fully accommodate prisoners' rights at low costs to valid penological interests. *Turner v. Safley*, 482 U.S. at 89-91. The Defendants added that the Supreme Court neither held any single factor to be dispositive, nor did it require all four factors to be met. *See Scott v. Mississippi Dept. of Corrections*, 961 F.2d 77, 80 (5th Cir. 1992) (Neither *Turner* nor *O'Lone*, however, require a court to weigh evenly, or even consider, each of these four factors). The Defendants noted that the Fifth Circuit went on to hold that the first factor is the controlling question posed in these cases; the other factors merely help a court determine if the connection is logical. *Id.* at 81.

The Defendants asserted that the regulations involved in this case involve the policy that allows officers to search the property of an inmate and confiscate property that does not belong to

---

[1] 482 U.S. 78 (1987).

that inmate. They argued that the Plaintiff cannot claim that the policy allowing property searches infringes on his religious rights. They argued that searches are clearly penologically necessary. They noted that the Plaintiff is not challenging the policy regarding religious property because prison policy specifically allows an inmate to possess the items of which he complains, provided that the inmate keeps proper ownership papers. They noted that the Plaintiff is not complaining about a policy that prevents him from practicing his religious beliefs.

The Defendants noted that prison records show that the Plaintiff did not have property papers for his prayer rug and that his Koran was confiscated because he had altered it with tape, in violation of TDCJ policy. Exhibit A (grievance records) at 12-15. His prayer beads were confiscated earlier due to improper usage by wearing them around his neck. Exhibit B. They argued that the property search that led to confiscation based on Plaintiff's inability to show ownership clearly has a legitimate penological purpose. They noted that inmates must be required to show legitimate ownership of property in order to prevent inmates from acquiring property through force, bribes or other illegitimate means. They further noted that the Plaintiff did not show that the damage to his religious property adversely affected his ability to practice his religion. They noted, for example, that if a Christian cross was damaged, the claimant would only have a state court property case because he would not be able to show that he was unable to practice his religion because of the damaged cross. The Defendants noted that the Plaintiff has not presented any evidence that he was unable to practice his religion, thus he at most had a simple conversion claim that would not invoke the jurisdiction of this Court.

With respect to the claim that Chaplain Kiser prevented the Plaintiff from attending Ramadan functions, Chaplain Kiser asserted that he was not at fault because the Plaintiff was in pre-hearing detention and solitary confinement for much of the time and was prevented from going for security reasons due to his own actions. The Defendants noted that the Plaintiff's grievance records show that he knew that this was the reason he was prevented from attending Ramadan activities. *See* Exhibit A at 2-3. They argued that Chaplain Kiser did not have the authority to override a security

4

decision in order to allow the Plaintiff to attend services when he was prevented from doing so by security. *See* Exhibit C (Kiser's affidavit).

With respect to RLUIPA, the Defendants noted that the statute provides that no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000c-1(a)(1)-(2). They noted that although RLUIPA imposes the strict scrutiny test on prison regulations, the Supreme Court recently held that courts are to apply that standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). "While the Act adopts a 'compelling governmental interest' standard . . . '[c]ontext matters' in the application of that standard." *Id.* at 722-23. The Defendants correctly noted that the Supreme Court found that prison security is a compelling state interest, and deference is due to institutional officials' expertise in this area. *Id.* at 725 n.13. RLUIPA does not elevate accommodation of religious observances over a prison's need to maintain order and safety, and any accommodation must be measured so that it does not override other significant interest. *Id.* at 722. A prison is free to resist requests for religious accommodations that either impose unjustified burdens on other prisoners or jeopardize the effective functioning of a prison. *Id.* at 726.

The Defendants noted that the Fifth Circuit explored the burdens of persuasion with RLUIPA in *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004). The initial burden falls on the Plaintiff to demonstrate that the government practice complained of imposes a "substantial burden" on his religious exercise, which requires the court to answer two questions: (1) is the burdened activity "religious exercise" and, if so, (2) is the burden "substantial"? *Adkins*, 393 F.3d at 567. A government action or regulation creates a "substantial burden" on a religious exercise if it truly

5

pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs. *Id.* at 570.

The Defendants noted that the issue before the Court concerns property policy. They noted that the Plaintiff is not complaining of a policy regarding his religious property, thus they argued that the claim is not proper under RLUIPA anyway. They argued that the claim is more properly brought in state court as a conversion claim. They cited their previous arguments in again arguing that Defendants Milligan and Norman were within policy and furthered a compelling governmental interest of making sure that inmate property is properly possessed, stored and used. With regard to the Plaintiff being taken off the Ramadan list, they argued that the records show that this is not what happened. Instead, the Plaintiff was confined in solitary confinement and PHD at the time.

In conclusion, the Defendants argued that the Plaintiff had not shown a constitutional violation and that he failed to overcome their entitlement to qualified immunity. They argued that they are entitled to summary judgment.

Plaintiff's Response

The Plaintiff did not file a response to the motion for summary judgment. On August 20, 2008, the Court issued a revised scheduling order setting forth deadlines in this case. The deadline for filing a response to the motion for summary judgment was September 11, 2008. The Plaintiff was given notice about the deadlines for filing a response, but he failed to file one.

Discussion and Analysis

Summary judgment is proper when the pleadings and evidence on file show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party for summary judgment has the burden of proving the lack of a genuine issue as to all the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1221-23 (5th Cir. 1985).

In deciding a motion for summary judgment, the Court must make a threshold inquiry in determining whether there is a need for a trial. "In other words, whether there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." 477 U.S. at 247-48. In making this threshold inquiry, the Court must consider that "[s]ummary judgment is proper when, viewed in the light most favorable to the non-moving party, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Smith v. Xerox Corp.,* 866 F.2d 135, 137 (5th Cir. 1989) (citations omitted); Fed. R. Civ. P. 56(c).

Once the movants make a showing that there is no genuine material fact issue to support the nonmovant's case, the nonmovant cannot survive a motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988); *see also Celotex*, 477 U.S. at 324. Rather, he must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. To carry this burden, the nonmovant must present evidence sufficient to support a resolution of the factual issues in his favor. *Anderson*, 477 U.S. at 257. Summary judgment is proper if the affidavits, depositions, answers, and admissions on file fail to establish the existence of an element essential to the plaintiff's case and as to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23. The nonmovant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment. *See, e.g., Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 589-90 (5th Cir. 2004); *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).

Courts must employ summary judgment device cautiously. *Jackson v. Procunier*, 789 F.2d 307 (5th Cir. 1986). In prisoner *pro se* cases, courts must be careful to "guard against premature truncation of legitimate lawsuits merely because of unskilled presentations." *Murrell v. Bennett*, 615 F.2d 306, 311 (5th Cir. 1980).

The parties agree with the basic fact that several religious items in the Plaintiff's possession were confiscated, including a Koran, prayer rug and beads. The Defendants have submitted competent summary judgment evidence showing that the Plaintiff did not have property papers for the prayer rug, that the Koran had been altered with tape, and that he was improperly using the beads by wearing them around his neck. The Plaintiff has not submitted competent summary judgment evidence disputing the reasons provided for the confiscation of these items. It is further noted that he testified at the *Spears* hearing that he received a new Koran at the Bill Clements Unit, but he had to go without a Koran for four months. The Defendants have also submitted competent summary judgment evidence indicating that the Plaintiff was never taken off of the Ramadan list; instead, he was unable to participate because of security reasons. More specifically, he was confined in prehearing detention or solitary confinement at the time. The Plaintiff has not submitted competent summary judgment evidence disputing this explanation. The question for the Court is whether the Plaintiff has a basis for a First Amendment or RLUIPA claim based on these facts.

The Defendants argued that they are entitled to summary judgment based on qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The objective reasonableness of an official's conduct must be measured with reference to the law as it existed at the time of the conduct in question. *Anderson*, 483 U.S. at 639; *Jackson v. City of Beaumont Police Department*, 958 F.2d 616, 620 n. 5 (5th Cir. 1992) (citations omitted). *See King v. Chide*, 974 F.2d 653 (5th Cir. 1992) (discussing qualified immunity in the context of force used against an arrestee). The evaluation of a qualified immunity defense involves a two-step process,

which was discussed by the Supreme Court as follows:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." *Ibid.*

*Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007); *Bias v. Woods*, No. 05-10890, 2008 WL 2902565 (5th Cir. July 29, 2008). The Fifth Circuit has stated that the second step concerns whether the officer's conduct was objectively reasonable in light of the law that was "clearly established" at the time of the alleged violation. *Bias v. Woods*, at *3.

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. R. Civ. P. 56(c). "When the moving party carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (footnote omitted). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

Issues concerning qualified immunity should be resolved at the earliest possible stage. When factual issues are still in dispute at the time of trial, a court may not be able to make a decision as to whether officers are entitled to qualified immunity until the factual issues are resolved by a jury. *See Lampkin v. City of Nacogdoches*, 7 F.3d 430 (5th Cir. 1993). In such cases, the jury will have to decide "the underlying historical facts in dispute that are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of existing law and facts available to them." *Id.* at 435. *See also Presley v. City of Benbrook*, 4 F.3d 405, 409-10 (5th Cir.

9

1993). The Fifth Circuit has also held that "while qualified immunity ordinarily should be decided by the court long before trial, if the issue is not decided until trial the defense goes to the jury which must then determine the objective legal reasonableness of the officers' conduct." *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000).

The Plaintiff has been permitted to proceed with his First Amendment and RLUIPA claims. With respect to the First Amendment free exercise claim, the Supreme Court has made it clear that prisoners must be provided "reasonable opportunities" to exercise their religious beliefs. *Cruz v. Beto*, 405 U.S. 319 (1972)(*per curiam*). The Supreme Court recognized, however, that limits may be placed on the religious rights that must be afforded to inmates. In *Turner v. Safley*, the Supreme Court held "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," and "[w]hen a prison regulation impinges upon the inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. The Supreme Court identified four factors that should be considered in determining the reasonableness of a regulation: (1) there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) are there alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of alternatives is evidence of the reasonableness of a prison regulation. *Id.* 89-91. *See Powell v. Estelle*, 959 F.2d 22, 24 (5th Cir. 1992). Shortly after issuing the *Turner* decision, the Supreme Court applied the test to uphold a prison policy that prevented inmates from attending Islamic prayer services. *O'Lone v. Estate of Shabazz*, *supra*.

Applying these four factors to the present case, it is initially noted that prison systems have a legitimate government interest in security. *See Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599, 608 (5th Cir. 2008); *Scott v. Mississippi Dept. of Corrections*, 961 F.2d at 80. The Defendants talked about the policy that permits the confiscation of contraband, but they failed to provide a copy of the policy. They likewise failed to submit affidavits from Defendants Norman and

Milligan as to why they confiscated the property. They asserted that inmates must be required to show legitimate ownership of property in order to prevent inmates from acquiring property through force, bribes or other illegitimate means, but they did not cite any case law in support of the position or a prison policy that authorized confiscation for that reason. They asserted that the prayer rug was confiscated because the Petitioner did not have property papers. It is noted that the Plaintiff showed in the original complaint that he had the prayer rug at the Stiles Unit before he was transferred to the Beto Unit and that Chaplain Bell at the Stiles Unit sent an inter-office communication to the Stiles Unit Property Office specifying that the Plaintiff should be allowed to keep it. *See* docket entry 1-2, page 14. The Court can understand the basic principle that inmates should have property papers, but it does not seem appropriate that he should be faulted when property papers were not given to him when it was established that he should be able to keep the prayer rug. The Plaintiff's version of events from June 29, 2006, supports the Plaintiff's argument that Norman and Milligan confiscated the prayer rug at this time because they were angry at him. The Court can likewise see an argument for confiscating property if it is a security risk because it has been altered, but once again the Defendants did not cite any case law in support of the position or a prison policy that authorized confiscation for that reason. It is further noted that the first *Turner* prong specified that there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. In the abstract, the Court can appreciate the fact that altered items may be a security risk, however, it is hard to understand how a Koran that has been taped, possibly to keep it from falling apart, should be viewed as a security risk. The Defendants need to show how a taped Koran constitutes a security risk. With respect to the beads, the Defendants cited Exhibit B, which showed that the prayer beads were confiscated by Defendant Norman on March 27, 2006, because the Plaintiff was wearing them around his neck. Once again, the Defendants have not shown a policy that authorized the confiscation because the beads were being worn around the Plaintiff's neck. They have not shown a valid, rational connection between a prison regulation and the legitimate governmental interest put forward for it. The Court has an additional concern that the underlying

11

First Amendment claim may not have been given the degree of attention that is warranted. Inmates must be given reasonable opportunities to exercise their religious beliefs. The three items confiscated in this case went beyond mere property; instead, the items involve the property necessary for the Plaintiff to exercise his religious beliefs. The Defendants may ultimately be able to show with affidavits, copies of prison policies and case law that the confiscation of these items was appropriate, but they had not made such a showing in the present motion.

With respect to the Plaintiff's inability to participate in religious activities, such as Ramadan, the competent summary judgment evidence reveals that the Plaintiff was never left off of the list of eligible participants. Chaplain Kiser never removed him from the list. Chaplain Kiser had no involvement in this matter. The Plaintiff was unable to participate in religious activities because he was confined in prehearing detention or solitary confinement due to misconduct. Chaplain Kiser was not involved in his placement in prehearing detention or solitary confinement. Fundamental to any civil rights lawsuit, a plaintiff must ordinarily articulate a set of facts that illustrates the defendant's participation in the alleged wrong. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). Chaplain Kiser is entitled to summary judgment on the First Amendment claim because he was not at fault in the Plaintiff's inability to attend such activities.

The next issue is whether the Plaintiff's rights under RLUIPA were violated. RLUIPA provides that no "government shall impose a substantial burden on the religious exercise of a person residing in or confined in an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). This standard was carried over from the Religious Freedom Restoration Act ("RFRA"), but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators." 146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

RLUIPA is a somewhat new statute. The standard to employ in evaluating RLUIPA claims is a developing area of the law. For that reason, a detailed analysis of the cases that have thusfar

been published would be instructive. There are five published cases which should be discussed with regard to the applicable legal standards. These are: *Cutter v. Wilkinson*, 544 U.S. 709 (2005); *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004); *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007); *Longoria v. Dretke*, 507 F.3d 898 (5th Cir. 2007); and *Mayfield v. TDCJ*, 529 F.3d 599 (5th Cir. 2008).

In *Cutter*, members of various "non-mainstream" religions in the Ohio prison system brought suit under RLUIPA complaining that the prison officials failed to accommodate their religious exercise in various ways, including denying them access to religious literature, denying the same opportunities for group worship enjoyed by adherents of mainstream religious, forbidding them to adhere to dress and grooming requirements, withholding ceremonial objects substantially identical to those permitted to adherents of mainstream religions, and failing to provide chaplains trained in their faith.

In response, the prison officials mounted a facial challenge to RLUIPA, arguing *inter alia* that RLUIPA improperly advances religion in violation of the Establishment Clause. The district court denied the defendants' motion to dismiss, but the Sixth Circuit reversed this decision, holding that RLUIPA violated the Establishment Clause by giving "greater protection to religious rights than to other constitutionally protected rights." This decision was in turn reversed by the Supreme Court.

The Supreme Court began its analysis by tracing the history of congressional efforts to accord religious exercise heightened protection from government-imposed burdens. Congress responded to the Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) by enacting RFRA in 1993. The Court invalidated this law in *City of Boerne v. Flores*, 521 U.S. 507 (1997). Congress then enacted RLUIPA. This law provides that no state or local government shall impose a substantial burden upon a person residing in or confined to an institution unless the government shows that the burden furthers a compelling governmental interest and does so by the least restrictive means. This standard was carried over from RFRA, but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience

13

and expertise of prison and jail administrators." 146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

In rejecting the Sixth Circuit's conclusion, the Supreme Court said first that RLUIPA is consistent with the Establishment Clause because it "alleviates exceptional government-created burdens on private religious exercise." *Cutter*, 544 U.S. at 720. The Supreme Court noted that inmates are dependent upon the government's permission and accommodation for exercise of their faith. However, the Supreme Court then stated that "we do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." The Supreme Court explained that while the Act adopts a "compelling governmental interest" standard, "context matters" in the application of this standard. The Supreme Court said that lawmakers supporting RLUIPA were "mindful of the urgency of discipline, order, safety, and security in penal institutions," quoting Sen. Hatch, and said that these lawmakers anticipated that courts would apply the Act's standard with "due deference to the expertise and experience of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of cost and limited resources." *Id.* at 723. Finally, the Supreme Court said that should inmate requests for religious accommodations become excessive, impose unjustified burdens upon other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition. *Id.* at 726.

In *Adkins v. Kaspar*, inmate Donald Adkins was a member of a church called the Yahweh Evangelical Assembly ("YEA"). He complained that he was not permitted to observe particular days of rest and worship, each Saturday for the Sabbath and certain holy days during the year. A hearing pursuant to *Flowers v. Phelps*, 956 F.2d 488, *modified in part on other grounds* 964 F.2d 400 (5th Cir. 1992) was conducted by the district court.

At the hearing, YEA elder Jerry Healan testified that the church required adherents to meet together on each Sabbath and to make particular observances on specific holy days. He said that he went to the prison unit approximately once a month to oversee Sabbath services, but that the

14

distances involved made more frequent trips impracticable. Healan stated that 25 to 30 inmates at Coffield attended the services. Healan stated that he and Adkins corresponded regularly and that Adkins had authored several articles which were published in the YEA newsletter and on the Internet. Healan also said that he had been allowed to come to Coffield and conduct a baptismal ceremony for Adkins and other inmates.

Adkins testified that he had been granted lay-ins for holy days and the Sabbath, but that he and other YEA members could not assemble and hold services on their own. He stated that he and other YEA members had been allowed to attend tape sessions and listen to tapes sent by Healan, but that they could only do this on Mondays; tape sessions could not be conducted on Saturdays unless an accredited religious volunteer was present.

Leonard Sanchez, the senior chaplain at the Coffield Unit, testified that YEA members could congregate on the Sabbath if Healan was present (Healan was the only accredited volunteer for YEA), and that if Healan could come more frequently, arrangements would be made for YEA members to congregate, conditioned on availability of space and time. Another couple, the McEnanys, had not yet been accredited as YEA volunteers, but Sanchez said that when they were, they could lead YEA services on their own.

The district court concluded that the defendants had not denied Adkins a reasonable opportunity to practice his religion and that they had not burdened his religious exercise in violation of RLUIPA. On appeal, the Fifth Circuit examined First Amendment, equal protection and RLUIPA arguments. This opinion will focus only on the part of the decision concerning RLUIPA. The Fifth Circuit held that in RLUIPA claims, the plaintiff first has the burden of demonstrating that the governmental practice imposes a "substantial burden" on his religious exercises. This requires the court to answer two questions: (1) is the burdened activity a "religious exercise," and (2) if so, whether the burden is "substantial."

The Fifth Circuit acknowledged that the term "religious exercise" in RLUIPA means any exercise of religion, whether or not compelled by or central to a system of religious belief. The

exercise alleged to be burdened, which was the YEA Sabbath and holy day gatherings, was clearly a "religious exercise" under this definition, requiring review of the second question, whether or not the burden was "substantial."

In answering this question, the Fifth Circuit first noted that the term "substantial burden" was not defined in the statute, and different circuits had defined the term differently. After reviewing the definitions adopted by the Seventh, Eighth, Ninth, and Eleventh Circuits, as well as pertinent Supreme Court decisions, the Fifth Circuit concluded that the proper definition was as follows:

> [F]or purposes of applying the RLUIPA in this circuit, a governmental action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly modify his religious beliefs.
>
> And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available non-trivial benefit, and, on the other hand, following his religious beliefs.
>
> On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

*Adkins*, 393 F.3d at 569-70. The Court again emphasized that no test may require that the religious exercise be central to the adherent's belief system; however, the Court said, "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion." In applying this test to Adkins, the Court said that the requirement that an outside volunteer lead worship services does not place a substantial burden upon Adkins' religious exercise, and therefore did not violate RLUIPA. *Adkins*, 393 F.3d at 571.

In *Longoria*, plaintiff Juan Longoria, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit told him not to mutilate his hair. He advised prison officials that he would not cut his hair due to his religious beliefs, and was told that

16

an exemption could not be authorized for him under the grooming policy. Longoria received a disciplinary case for refusing to cut his hair. He sued under RLUIPA.

The Fifth Circuit's opinion in *Longoria* relied heavily on its opinion in *Diaz v. Collins*, 114 F.3d 69 (1997). The Fifth Circuit made the following finding: "Because the test under RLUIPA is sufficiently the same as that previously imposed under RFRA, we hold TDCJ-ID did *not* violate Longoria's rights by, pursuant to the grooming policy, denying him permission to grow his hair." *Longoria*, 507 F.3d at 901. The Fifth Circuit noted that it held that TDCJ-ID's grooming policy did not violate RFRA because it was related to security, it involved a compelling state interest, and the security interest at stake could not meaningfully be achieved by any different or lesser means." *Id.* at 902. The Fifth Circuit reiterated that "in enacting the RFRA, Congress intended to continue to extend substantial deference to prison officials in legitimate security matters." *Id.*

In *Baranowski*, the Fifth Circuit was concerned with a Jewish inmate's complaint that he had not been provided weekly Sabbath and other holy day services, had been denied the use of the chapel for religious services, and had been denied a kosher diet. With respect to RLUIPA, the Fifth Circuit reviewed the standards discussed in *Cutter* and *Adkins*. It was noted that in *Adkins* the Plaintiff and other YEA members were not prevented from congregating by prison policy but by a dearth of clergy and volunteers. *Baranowski*, 486 F.3d at 125. The Fifth Circuit followed its decision in *Adkins* in holding that the requirement that a rabbi or approved volunteer lead services did not place a substantial burden on Baranowski's free exercise of his Jewish faith, within the contemplation of RLUIPA. *Id.*

The Fifth Circuit went own to hold that the failure to provide kosher food "may be deemed to work a substantial burden upon Baranowski's practice of his faith." *Id.* With respect to the compelling interest test, the Fifth Circuit made the following comments:

> Courts should apply the "compelling governmental interest" standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" (citations omitted). RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need

17

> to maintain good order, security, and discipline or to control costs. *See Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006).
>
> The uncontroverted summary judgment evidence submitted by Defendants established that TDCJ's budget is not adequate to cover the increased expense of either providing a separate kosher kitchen or bringing in kosher food from outside; that TDCJ's ability to provide a nutritionally appropriate meal to other offenders would be jeopardized (since the payments for kosher meals would come out of the general food budget for all inmates); that such a policy would breed resentment among other inmates; and that there would be an increased demand by other religious groups for similar diets.
>
> Based on the record before us, we hold that this policy is related to maintaining good order and controlling costs and, as such involves compelling governmental interests. . . . Further, the administrative and budgetary interests cannot be achieved by any different or lesser means.

*Id.* at 125-26. The Fifth Circuit upheld the granting of summary judgment on Baranowski's summary judgment claim.

The final important published opinion is the Fifth Circuit's recent decision in *Mayfield v. TDCJ*. The Fifth Circuit was concerned with the practices of the Odinist/Asatru faith. Odinism was described as the ancestral folk religion of Northern Europe and a polytheistic, nature-based faith that worships a variety of gods and goddesses. Worship services, known as Blotar, involved religious paraphernalia including runestones, a blessing bowl, a non-alcoholic beverage, a drinking horn, an altar cloth, a symbolic Thor's hammer made of material such as cardboard, and a leafed evergreen branch. The individual study of runestones was described as essential to the Odinist faith. There were just 41 out of 2,869 inmates at Mayfield's unit who listed their religious preference as Odinist/Asatru. The plaintiff submitted affidavits showing that Blotar should be conducted at least once a month. The only approved volunteer, who lived in Arkansas, could not come that often. TDCJ denied Mayfield's request to conduct meetings with security present and without an outside volunteer. The Fifth Circuit reversed the grant of summary judgment noting that there were disputed issues of fact pertinent to the substantial burden inquiry, including the availability of outside volunteers and the lack of alternatives available. The Fifth Circuit also noted that the district court failed to issue a conclusion as to RLUIPA's necessary third step: whether TDCJ has shown the application of its policy was narrowly tailored as a matter of law. *Mayfield*, 529 F.3d at 615.

18

Applying these principles to the present case, the first issue for the Court's consideration is whether TDCJ has imposed a substantial burden on the religious exercise of the Plaintiff. Muslims inmates have been permitted to exercise their beliefs in a number of ways. Among other things, they may own a Koran, prayer rug and prayer beads. Norman and Milligan confiscated such items belonging to the Plaintiff. As previously noted, they have not submitted copies of the policy that authorized the confiscation. They have not submitted affidavits explaining why they confiscated the property and if it was for reasons authorized by policy. They failed to cite any case law supporting such confiscation. The confiscation of the religious property burdened the Plaintiff's ability to practice his religion. He testified that he could not say his prayers without his prayer rug and beads. He could not study his Koran. The confiscation of these items took away the very items he needed to practice his religion. The confiscation placed a substantial burden on the Plaintiff's ability to practice his religion. Since the confiscation placed a substantial burden on the Plaintiff's ability to practice his religion, then Norman and Milligan must show that such confiscation furthered a compelling governmental interest and did so by the least restrictive means. The Defendants argued that the policies in this case furthered a compelling governmental interest in making sure that inmate property was properly possessed, stored and used, although they once again failed to support their arguments with copies of policies, affidavits and case law. The Defendants did not address whether the policies furthered the compelling governmental interest of security by the least restrictive means. As such, Defendants Norman and Milligan have not shown that they are entitled to summary judgment based on RLUIPA.

It is again noted that Chaplain Kiser has submitted an affidavit showing that he had no involvement in keeping the Plaintiff from attending religious activities, such as Ramadan. The Plaintiff has not submitted any competent summary judgment evidence disputing the affidavit. Chaplain Kiser is thus entitled to summary judgment based on the RLUIPA claim.

This brings us back to the qualified immunity argument. The Plaintiff has arguably shown a violation of his rights under the First Amendment and RLUIPA. Defendants Norman and Milligan

have not shown that there were no violations of his rights under the First Amendment and RLUIPA. Secondly, the competent summary judgment evidence is insufficient to show that Norman and Milligan's conduct was objectively reasonable under existing clearly established law. Norman and Milligan perhaps may be able to submit copies of affidavits, policies and case law that would show that they are entitled to qualified immunity, but they have not done so in this motion.

Finally, the Court notes that the Defendants stated in their motion that they are entitled to summary judgment based on Eleventh Amendment immunity, but they never developed the issue. They have not shown that they are entitled to summary judgment based on such immunity, thus the motion will not be granted with respect to that defense. It is accordingly

**ORDERED** that the Defendants' motion for summary judgment (docket entry #47) is **GRANTED**, in part, and **DENIED**, in part. It is further

**ORDERED** that the claims against Chaplain Charles Kiser are **DISMISSED** with prejudice. It is further

**ORDERED** that Defendants Norman and Milligan have thirty days from the issuance of this order to submit a properly documented motion showing that they are entitled to summary judgment. It is finally

**ORDERED** that the Plaintiff has thirty days from the submission of a motion for summary judgment to file a response. The Plaintiff is placed on notice that the lawsuit may be dismissed if he fails to file a response to any motions for summary judgment submitted by the Defendants.

**So ORDERED and SIGNED this 1st day of October, 2008.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE