IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| DAVID L. SHAW, #689847 | § | |
| VS. | § | CIVIL ACTION NO. 6:07cv443 |
| KAREN NORMAN, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David L. Shaw, a prisoner previously confined at the Beto Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. § 1983. The Defendants remaining in the lawsuit are Beto Unit Property Officers Karen Norman and Sherri L. Milligan. The complaint was referred to the undersigned by consent of the parties pursuant to 28 U.S.C. § 636(c).

## History of the Case

The original complaint was filed on September 17, 2007. The Plaintiff complained about the destruction of his property, including legal and religious property. He also complained about Chaplain Kiser removing him from the Ramadan list. On April 4, 2008, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), to consider the Plaintiff's claims. On April 28, 2008, the Court issued a Memorandum Opinion permitting the Plaintiff to proceed with his claims concerning the denial of religious rights, as protected by the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He was permitted to proceed with such claims against Karen Norman, Sherri L. Milligan and Chaplain Kiser. All remaining claims were dismissed. On October 1, 2008, the Court granted Chaplain Kiser's motion for summary judgment. The present Memorandum Opinion concerns the Defendants' amended motion for summary judgment (docket entry #57) and the Plaintiff's response (docket entry #60).

1

### Plaintiff's Allegations

The facts of the case relating to the Plaintiff's claims against Defendants Norman and Milligan were fully developed during the *Spears* hearing. He testified that the religious property that was confiscated in this case had been previously inventoried by Officer Black on January 2, 2006. She did not confiscate any of his property. On June 29, 2006, Officers Karen Norman and Sherri Milligan conducted another search and confiscated significant portions of his property. His religious property was confiscated, including his Koran, prayer rug and beads. The property was subsequently destroyed. The Plaintiff testified that the only comfort he has in prison is his religion, and his religious items were taken. He noted that he could not say his prayers without his prayer rug and beads. The confiscation of his property made him depressed and lose focus. He was sent to a psychiatric unit for 45 days and eventually transferred to the Clements Unit.

The Plaintiff testified that Property Officers Karen Norman and Sherri Milligan were the ones who actually confiscated his property. At the time of the search, he was the last inmate among several inmates to show up with his property. He noted that he had collected a lot of property over fifteen years in prison. Norman and Milligan became angry at him for being slow, thus they just took his property. An inmate at the Bill Clements Unit gave him another copy of the Koran, but he had to go without it for about four months. Warden Sloan testified under oath during the *Spears* hearing that Muslim inmates are normally permitted to have a copy of the Koran and a prayer rug.

### Defendants' Motion for Summary Judgment

Defendants Milligan and Norman filed an amended motion for summary judgment (docket entry #57) on October 31, 2008. They filed a supplement (docket entry #58) on November 6, 2008. They argued that they are entitled to summary judgment based on qualified immunity and because they did not violate the Plaintiff's rights under the First Amendment and RLUIPA. In support of their motion, they attached a copy of Administrative Directive 03.72 on Offender Property and an affidavit from Defendant Milligan. In their original motion for summary judgment, they also submitted relevant grievance records and relevant property records.

Defendant Milligan gave the following explanation as to her actions in her affidavit:

> Offenders are allowed to keep certain property, including certain types of religious property, in their cells. Policy dictates what religious property is available for offenders of various faith codes. As a property officer, I am not involved in the decision over what religious property is allowed. Even if an offender's religious items are allowed by policy, he must have property papers or be able to show ownership for the items. If an offender has had no funds in his trust fund, but manages to acquire property anyway and cannot show ownership, the property must be confiscated according to policy. This policy is [in] place to prevent offenders from stealing property from each other and to prevent gambling with property. If an offender does not have property papers for a specific item, it is confiscated because it is likely that the offender acquired them illegally. If this policy were not enforced, the likelihood of violence and fights over property would be greatly increased. Property will also be confiscated if it is altered in any way. This is so to prevent property from becoming dangerous, being used to make weapons or being used in any way that would compromise the security of the prison unit.
>
> With regards to the confiscation of religious property, I do not specifically remember the incident in question. However, the records show that the items that were confiscated were taken because Offender Shaw could not show ownership or because they were altered. This confiscation was in accordance with policy. I do not confiscate offender property unless I am required to do so by policy, and would never intentionally harm or disrespect the property of any offender.

The Defendants noted that prison grievance records show that the Plaintiff did not have property papers for his prayer rug and that his Koran was confiscated because he had altered it with tape, in violation of TDCJ policy. His prayer beads had been confiscated on an earlier occasion, on March 27, 2006, due to improper usage by wearing them around his neck.

The Defendants' legal arguments supporting their motion for summary judgment shall be fully explored in the Discussion and Analysis section of this Memorandum Opinion.

## Plaintiff's Response

The Plaintiff filed a response (docket entry #60) to the motion for summary judgment on December 1, 2008. He attached his own affidavit to the response. He argued that the Defendants are not entitled to summary judgment based on qualified immunity because their conduct was objectively unreasonable. He asserted that his religious property, along with other property, was confiscated despite papers on record and policy as provided by AD-03.72. He noted that policy provided that no property shall be destroyed unless it was determined to be dangerous as contraband or altered. He argued that his prayer rug and beads were not dangerous, contraband nor altered. His

Koran was not dangerous, contraband or altered just because he had dropped it a few times. He added that he had never heard during his fifteen years of incarceration of a policy stating that he could not have tape that was clear on his Koran. Otherwise, he would have removed the tape and never placed the tape on it.

With respect to *Turner v. Safley*, 482 U.S. 78 (1987), the Plaintiff noted that the Supreme Court specified that a regulation has to be reasonable and that there has to be a legitimate, neutral governmental interest used to justify it. The Plaintiff asserted that there were no policies to justify the confiscation of his property. Moreover, even if a policy did exist, he could not mail his property home or send it home during a family visit, thus there were no alternative means to resolve the issue. He asserted that prison policies provide that all property confiscated as contraband is to be photographed and the inmate is to receive a disciplinary case, but these requirements were not followed. He asserted that the Defendants' reference to policies permitting them to confiscate his religious property as contraband was simply an excuse to cover-up a clear violation of his constitutional rights without informal resolution. He argued that prison personnel believe that they can do whatever they want to and get away with it.

With respect to RLUIPA, the Plaintiff focused on the least restrictive means of furthering a compelling a compelling governmental interest. He argued that the Defendants have placed a substantial burden on his religious exercise. He stressed that prayer is the second most important pillar of his religion and that he must recite the Koran, and the Defendants took away the items that he must rely on in the exercise of his religious beliefs. He asserted that their actions caused him great hardship and mental and emotional injury. Their actions caused him to lose focus. He argued that their motion for summary judgment should be denied.

Discussion and Analysis

Summary judgment is proper when the pleadings and evidence on file show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party for summary judgment has the burden of proving

the lack of a genuine issue as to all the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1221-23 (5th Cir. 1985).

In deciding a motion for summary judgment, the Court must make a threshold inquiry in determining whether there is a need for a trial. "In other words, whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." 477 U.S. at 247-48. In making this threshold inquiry, the Court must consider that "[s]ummary judgment is proper when, viewed in the light most favorable to the non-moving party, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Smith v. Xerox Corp.,* 866 F.2d 135, 137 (5th Cir. 1989) (citations omitted); Fed. R. Civ. P. 56(c).

Once the movants make a showing that there is no genuine material fact issue to support the nonmovant's case, the nonmovant cannot survive a motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988); *see also Celotex*, 477 U.S. at 324. Rather, he must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. To carry this burden, the nonmovant must present evidence sufficient to support a resolution of the factual issues in his favor. *Anderson*, 477 U.S. at 257. Summary judgment is proper if the affidavits, depositions, answers, and admissions on file fail to establish the existence of an element essential to the plaintiff's case and as to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23. The nonmovant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment. *See, e.g., Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 589-90 (5th Cir. 2004); *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).

The Defendants argued that they are entitled to summary judgment based on qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The objective reasonableness of an official's conduct must be measured with reference to the law as it existed at the time of the conduct in question. *Anderson*, 483 U.S. at 639; *Jackson v. City of Beaumont Police Department*, 958 F.2d 616, 620 n. 5 (5th Cir. 1992) (citations omitted). *See King v. Chide*, 974 F.2d 653 (5th Cir. 1992) (discussing qualified immunity in the context of force used against an arrestee). The evaluation of a qualified immunity defense involves a two-step process, which was recently discussed by the Supreme Court as follows:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." *Ibid.*

*Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007); *Bias v. Woods*, No. 05-10890, 2008 WL 2902565 (5th Cir. July 29, 2008). The Fifth Circuit has stated that the second step concerns whether the officer's conduct was objectively reasonable in light of the law that was "clearly established" at the time of the alleged violation. *Bias v. Woods*, at *3.

In light of *Scott v. Harris*, the threshold question for the Court's consideration is whether the facts taken in a light most favorable to the Plaintiff show that the Defendants' violated a constitutional right. The Court notes, however, that many of the material facts are not in dispute. The Defendants confiscated the Plaintiff's religious items. They confiscated religious items that

6

Muslim inmates are ordinarily allowed to possess. The Plaintiff's prayer rug was confiscated because he did not have ownership papers. His Koran was confiscated because he placed clear tape on the cover after it began to fall apart, which was characterized as altering the property. Finally, his prayer beads were confiscated because he was seen wearing them around his neck. A factor in the consideration of the Plaintiff's lawsuit is that Officer Black had previously inventoried his property and had permitted him to keep it. He believes that the Defendants confiscated his religious property simply because they were angry at him for being slow.

The first issue for the Court's consideration is whether the Plaintiff has shown a violation of his First Amendment rights under the Free Exercise Clause. The Supreme Court has made it clear that prisoners must be provided "reasonable opportunities" to exercise their religious beliefs. *Cruz v. Beto*, 405 U.S. 319 (1972)(*per curiam*). The prison system has established policies permitting Muslim inmates to possess the type of items which were confiscated from the Plaintiff. The Supreme Court has recognized, however, that limits may be placed on the religious rights that must be afforded to inmates. In *Turner v. Safley*, the Supreme Court held "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," and "[w]hen a prison regulation impinges upon the inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. The Supreme Court identified four factors that should be considered in determining the reasonableness of a regulation: (1) there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) are there alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of alternatives is evidence of the reasonableness of a prison regulation. *Id.* 89-91. *See Powell v. Estelle*, 959 F.2d 22, 24 (5th Cir. 1992). Shortly after issuing the *Turner* decision, the Supreme Court applied the test to uphold a prison policy that prevented inmates from attending Islamic prayer services. *O'Lone v. Estate of Shabazz*, 482 U.S. 382 (1987).

In arguing that they are entitled to summary judgment, the Defendants noted that the Fifth Circuit has held that the first factor is the controlling factor in these cases; the other factors merely help a court determine if the connection is logical. *Scott v. Mississippi Dept. of Corrections*, 961 F.2d 77, 81 (5th Cir. 1992). The Defendants argued that the regulations involved in this case allow officers to search the property of an inmate and confiscate property that does not belong to that inmate. They argued that the Plaintiff cannot claim that the policy allowing property searches infringes on his religious rights, and that it is clearly penologically necessary. They noted that the Plaintiff is not challenging a policy allowing religious property because TDCJ policy specifically allows an inmate to possess the items of which he complains, provided that proper ownership papers are kept with them. They asserted that the Plaintiff is not complaining about a policy that prevents him from practicing his religious beliefs.

The Defendants stressed that the records show that the Plaintiff did not have property papers for his prayer rug and that his Koran was confiscated because it had been altered with tape. His prayer beads were confiscated due to improper usage. They argued that the property search that led to confiscation based on the Plaintiff's inability to show ownership clearly has a legitimate penological purpose and is required by TDCJ policy. They cited, in general, AD-03.72. They argued that inmates must be required to show legitimate ownership of property in order to prevent inmates from acquiring property through force, bribes or illegitimate means. They further argued that the Plaintiff did not show that the confiscation of his religious property adversely affected his ability to practice his religion. They argued that this is a simple conversion claim that would not invoke the jurisdiction of this Court.

The Court notes that the Supreme Court has held that the four factors discussed in *Turner* and *O'Lone* are factors to consider in evaluating First Amendment religion claims. With respect to *Scott v. Mississippi Dept. of Corrections*, the Fifth Circuit indeed held that the four factors were announced to assist a court's rationality review and that a court need not weigh evenly, or even consider, each of these factors. 961 F.2d at 80. More recently, the Fifth Circuit again noted that

8

while "*Turner's* standard encompasses four factors, we have noted that rationality is the controlling factor, and a court need not weight each factor equally." *Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008). The Fifth Circuit did not hold in either *Scott* or *Mayfield* that the factors could be disregarded or ignored. In *Mayfield*, the Fifth Circuit proceeded to apply the four factors in analyzing the plaintiff's claims. By comparison, the Defendants in this case cited the four factors and then ignored them. They did not attempt to apply the factors to the facts of this case. Instead, they merely asserted that the policy requiring inmates to show ownership has a legitimate penological purpose. The Defendants abdicated all efforts to address the four factors, and it is not this Court's responsibility to salvage their motion by *sua sponte* reviewing the four factors in their behalf.

It is clear, however, that prison systems have a legitimate governmental interest in security. *Id.* at 608. But there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. The Defendants asserted that the prayer rug was properly confiscated because the Petitioner did not have property papers. It is noted, however, that the Plaintiff showed in the original complaint that he had the prayer rug at the Stiles Unit before he was transferred to the Beto Unit and that Chaplain Bell at the Stiles Unit sent an inter-office communication to the Stiles Unit Property Office specifying that the Plaintiff should be allowed to keep it. *See* docket entry 1-2, page 14. The Court can understand the basic principle that inmates should have property papers, but it does not seem appropriate that he should be faulted when property papers were not given to him when it was established that he should be able to keep the prayer rug. Moreover, AD-03.72 § VI specifies that the disposition of confiscated property shall be coordinated between property officers on both units. It was established at the Stiles Unit that the prayer rug belonged to the Plaintiff. The Defendants would have been aware of the findings at the Stiles Unit if they had complied with policy to coordinate their activities with the property officers at the Stiles Unit. The Plaintiff's version of events from June 29, 2006, supports his argument that Norman and Milligan illegitimately confiscated the prayer rug because they were angry at him.

9

The Court has some appreciation for the need to confiscate property if it is a security risk because it has been altered. Other than attaching AD-03.72 to the motion for summary judgment, the Defendants did not cite a provision defining what is meant by altered property. They did not show that placing tape on a Koran came within such definition. It is again noted that it is not the responsibility of the Court to find the applicable provision, if one exists, and to make their case for them. It is again noted that the first *Turner* prong specified that there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. In the abstract, the Court can appreciate the fact that altered items may be a security risk, however, it is hard to understand how a Koran that has been taped, possibly to keep it from falling apart, should be viewed as a security risk.

With respect to the prayer beads, the Defendants noted that they were confiscated by Defendant Norman on March 27, 2006, because the Plaintiff was wearing them around his neck. Once again, the Defendants have not shown a policy that authorized the confiscation because the beads were being worn around the Plaintiff's neck. They have not shown that there was an actual security problem caused by his actions. They have not shown a valid, rational connection between a prison regulation and the legitimate governmental interest put forward for it. Also, the Defendants have failed to show that there was no alternative available to confiscating and destroying his beads. The Plaintiff appropriately argued that he could have been given a disciplinary case for improper usage. The act of confiscating and destroying the beads was an unnecessary and extreme measure. Similarly, the Defendants have not shown that there were no alternatives to confiscating and destroying the Plaintiff's prayer rug and Koran. The Defendants simply have not shown that their actions were reasonable, as that concept was defined by the Supreme Court in *Turner* and *O'Lone*.

The Court notes that the Defendants argued that the Plaintiff's claims amount to nothing more than a simple state court claim for conversion. However, the Fifth Circuit has emphasized that inmates have a basis for a due process claim when property is confiscated pursuant to policy. *See Allen v. Thomas*, 388 F.3d 147 (5th Cir. 2004). The Defendants' attempt to downplay the

significance of this case as a mere state claim is misplaced. The confiscation of the property at issue in this case triggers both First Amendment and due process concerns. Moreover, the Court has some concern about the attitude that has been exhibited by the Defendants regarding the Plaintiff's rights. They have been somewhat cavalier about a Muslim inmate's right to possess religious items. Inmates must be given reasonable opportunities to exercise their religious beliefs. The three items confiscated in this case went beyond mere property; instead, the items were essential for the Plaintiff to exercise his religious beliefs. The Defendants have been given two opportunities to show that they are entitled to summary judgment because there was no First Amendment violation, but they failed to make such a showing.

The next issue is whether the Plaintiff's rights under RLUIPA were violated. RLUIPA provides that no "government shall impose a substantial burden on the religious exercise of a person residing in or confined in an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). This standard was carried over from the Religious Freedom Restoration Act ("RFRA"), but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators." 146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

RLUIPA is a somewhat new statute. The standard to employ in evaluating RLUIPA claims is a developing area of the law. For that reason, a detailed analysis of the cases that have thusfar been published would be instructive. There are five published cases which should be discussed with regard to the applicable legal standards. These are: *Cutter v. Wilkinson*, 544 U.S. 709 (2005); *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004); *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007); *Longoria v. Dretke*, 507 F.3d 898 (5th Cir. 2007); and *Mayfield v. TDCJ, supra.*

In *Cutter*, members of various "non-mainstream" religions in the Ohio prison system brought suit under RLUIPA complaining that the prison officials failed to accommodate their religious exercise in various ways, including denying them access to religious literature, denying the same

11

opportunities for group worship enjoyed by adherents of mainstream religious, forbidding them to adhere to dress and grooming requirements, withholding ceremonial objects substantially identical to those permitted to adherents of mainstream religions, and failing to provide chaplains trained in their faith.

In response, the prison officials mounted a facial challenge to RLUIPA, arguing *inter alia* that RLUIPA improperly advances religion in violation of the Establishment Clause. The district court denied the defendants' motion to dismiss, but the Sixth Circuit reversed this decision, holding that RLUIPA violated the Establishment Clause by giving "greater protection to religious rights than to other constitutionally protected rights." This decision was in turn reversed by the Supreme Court.

The Supreme Court began its analysis by tracing the history of congressional efforts to accord religious exercise heightened protection from government-imposed burdens. Congress responded to the Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) by enacting RFRA in 1993. The Court invalidated this law in *City of Boerne v. Flores*, 521 U.S. 507 (1997). Congress then enacted RLUIPA. This law provides that no state or local government shall impose a substantial burden upon a person residing in or confined to an institution unless the government shows that the burden furthers a compelling governmental interest and does so by the least restrictive means. This standard was carried over from RFRA, but Congress noted that courts entertaining complaints under RLUIPA would accord "due deference to the experience and expertise of prison and jail administrators." 146 Cong. Rec. S7775 (joint statement of Sen. Hatch and Sen. Kennedy, July 27, 2000).

In rejecting the Sixth Circuit's conclusion, the Supreme Court held that RLUIPA is consistent with the Establishment Clause because it "alleviates exceptional government-created burdens on private religious exercise." *Cutter*, 544 U.S. at 720. The Supreme Court noted that inmates are dependent upon the government's permission and accommodation for exercise of their faith. However, the Supreme Court then stated that "we do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." The Supreme Court explained that while the Act adopts a "compelling governmental interest" standard, "context matters"

in the application of this standard. The Supreme Court said that lawmakers supporting RLUIPA were "mindful of the urgency of discipline, order, safety, and security in penal institutions," quoting Sen. Hatch, and said that these lawmakers anticipated that courts would apply the Act's standard with "due deference to the expertise and experience of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of cost and limited resources." *Id.* at 723. Finally, the Supreme Court said that should inmate requests for religious accommodations become excessive, impose unjustified burdens upon other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition. *Id.* at 726.

In *Adkins v. Kaspar*, inmate Donald Adkins was a member of a church called the Yahweh Evangelical Assembly ("YEA"). He complained that he was not permitted to observe particular days of rest and worship, each Saturday for the Sabbath and certain holy days during the year. A hearing pursuant to *Flowers v. Phelps*, 956 F.2d 488, *modified in part on other grounds* 964 F.2d 400 (5th Cir. 1992) was conducted by the district court.

At the hearing, YEA elder Jerry Healan testified that the church required adherents to meet together on each Sabbath and to make particular observances on specific holy days. He said that he went to the prison unit approximately once a month to oversee Sabbath services, but that the distances involved made more frequent trips impracticable. Healan stated that 25 to 30 inmates at Coffield attended the services. Healan stated that he and Adkins corresponded regularly and that Adkins had authored several articles which were published in the YEA newsletter and on the Internet. Healan also said that he had been allowed to come to Coffield and conduct a baptismal ceremony for Adkins and other inmates.

Adkins testified that he had been granted lay-ins for holy days and the Sabbath, but that he and other YEA members could not assemble and hold services on their own. He stated that he and other YEA members had been allowed to attend tape sessions and listen to tapes sent by Healan, but

that they could only do this on Mondays; tape sessions could not be conducted on Saturdays unless an accredited religious volunteer was present.

Leonard Sanchez, the senior chaplain at the Coffield Unit, testified that YEA members could congregate on the Sabbath if Healan was present (Healan was the only accredited volunteer for YEA), and that if Healan could come more frequently, arrangements would be made for YEA members to congregate, conditioned on availability of space and time. Another couple, the McEnanys, had not yet been accredited as YEA volunteers, but Sanchez said that when they were, they could lead YEA services on their own.

The district court concluded that the defendants had not denied Adkins a reasonable opportunity to practice his religion and that they had not burdened his religious exercise in violation of RLUIPA. On appeal, the Fifth Circuit examined First Amendment, equal protection and RLUIPA arguments. This opinion will focus only on the part of the decision concerning RLUIPA. The Fifth Circuit held that in RLUIPA claims, the plaintiff first has the burden of demonstrating that the governmental practice imposes a "substantial burden" on his religious exercises. This requires the court to answer two questions: (1) is the burdened activity a "religious exercise," and (2) if so, whether the burden is "substantial."

The Fifth Circuit acknowledged that the term "religious exercise" in RLUIPA means any exercise of religion, whether or not compelled by or central to a system of religious belief. The exercise alleged to be burdened, which was the YEA Sabbath and holy day gatherings, was clearly a "religious exercise" under this definition, requiring review of the second question, whether or not the burden was "substantial."

In answering this question, the Fifth Circuit first noted that the term "substantial burden" was not defined in the statute, and different circuits had defined the term differently. After reviewing the definitions adopted by the Seventh, Eighth, Ninth, and Eleventh Circuits, as well as pertinent Supreme Court decisions, the Fifth Circuit concluded that the proper definition was as follows:

> [F]or purposes of applying the RLUIPA in this circuit, a governmental action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly modify his religious beliefs.
>
> And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available non-trivial benefit, and, on the other hand, following his religious beliefs.
>
> On the opposite end of the spectrum, however, a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

*Adkins*, 393 F.3d at 569-70. The Court again emphasized that no test may require that the religious exercise be central to the adherent's belief system; however, the Court said, "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion." In applying this test to Adkins, the Court said that the requirement that an outside volunteer lead worship services does not place a substantial burden upon Adkins' religious exercise, and therefore did not violate RLUIPA. *Adkins*, 393 F.3d at 571.

In *Longoria*, plaintiff Juan Longoria, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit told him not to mutilate his hair. He advised prison officials that he would not cut his hair due to his religious beliefs, and was told that an exemption could not be authorized for him under the grooming policy. Longoria received a disciplinary case for refusing to cut his hair. He sued under RLUIPA.

The Fifth Circuit's opinion in *Longoria* relied heavily on its opinion in *Diaz v. Collins*, 114 F.3d 69 (1997). The Fifth Circuit made the following finding: "Because the test under RLUIPA is sufficiently the same as that previously imposed under RFRA, we hold TDCJ-ID did *not* violate Longoria's rights by, pursuant to the grooming policy, denying him permission to grow his hair." *Longoria*, 507 F.3d at 901. The Fifth Circuit noted that it held that TDCJ-ID's grooming policy did

not violate RFRA because it was related to security, it involved a compelling state interest, and the security interest at stake could not meaningfully be achieved by any different or lesser means." *Id.* at 902. The Fifth Circuit reiterated that "in enacting the RFRA, Congress intended to continue to extend substantial deference to prison officials in legitimate security matters." *Id.*

In *Baranowski*, the Fifth Circuit was concerned with a Jewish inmate's complaint that he had not been provided weekly Sabbath and other holy day services, had been denied the use of the chapel for religious services, and had been denied a kosher diet. With respect to RLUIPA, the Fifth Circuit reviewed the standards discussed in *Cutter* and *Adkins*. It was noted that in *Adkins* the Plaintiff and other YEA members were not prevented from congregating by prison policy but by a dearth of clergy and volunteers. *Baranowski*, 486 F.3d at 125. The Fifth Circuit followed its decision in *Adkins* in holding that the requirement that a rabbi or approved volunteer lead services did not place a substantial burden on Baranowski's free exercise of his Jewish faith, within the contemplation of RLUIPA. *Id.*

The Fifth Circuit went own to hold that the failure to provide kosher food "may be deemed to work a substantial burden upon Baranowski's practice of his faith." *Id.* With respect to the compelling interest test, the Fifth Circuit made the following comments:

> Courts should apply the "compelling governmental interest" standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" (citations omitted). RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs. *See Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006).
>
> The uncontroverted summary judgment evidence submitted by Defendants established that TDCJ's budget is not adequate to cover the increased expense of either providing a separate kosher kitchen or bringing in kosher food from outside; that TDCJ's ability to provide a nutritionally appropriate meal to other offenders would be jeopardized (since the payments for kosher meals would come out of the general food budget for all inmates); that such a policy would breed resentment among other inmates; and that there would be an increased demand by other religious groups for similar diets.
>
> Based on the record before us, we hold that this policy is related to maintaining good order and controlling costs and, as such involves compelling governmental interests. . . . Further, the administrative and budgetary interests cannot be achieved by any different or lesser means.

*Id.* at 125-26. The Fifth Circuit upheld the granting of summary judgment on Baranowski's summary judgment claim.

The final important published opinion is the Fifth Circuit's recent decision in *Mayfield v. TDCJ*. The Fifth Circuit was concerned with the practices of the Odinist/Asatru faith. Odinism was described as the ancestral folk religion of Northern Europe and a polytheistic, nature-based faith that worships a variety of gods and goddesses. Worship services, known as Blotar, involved religious paraphernalia including runestones, a blessing bowl, a non-alcoholic beverage, a drinking horn, an altar cloth, a symbolic Thor's hammer made of material such as cardboard, and a leafed evergreen branch. The individual study of runestones was described as essential to the Odinist faith. There were just 41 out of 2,869 inmates at Mayfield's unit who listed their religious preference as Odinist/Asatru. The plaintiff submitted affidavits showing that Blotar should be conducted at least once a month. The only approved volunteer, who lived in Arkansas, could not come that often. TDCJ denied Mayfield's request to conduct meetings with security present and without an outside volunteer. The Fifth Circuit reversed the grant of summary judgment noting that there were disputed issues of fact pertinent to the substantial burden inquiry, including the availability of outside volunteers and the lack of alternatives available. The Fifth Circuit also noted that the district court failed to issue a conclusion as to RLUIPA's necessary third step: whether TDCJ has shown the application of its policy was narrowly tailored as a matter of law. *Mayfield*, 529 F.3d at 615.

Applying these principles to the present case, the first issue for the Court's consideration is whether TDCJ has imposed a substantial burden on the religious exercise of the Plaintiff. Muslims inmates have been permitted to exercise their beliefs in a number of ways. Among other things, they may own a Koran, prayer rug and prayer beads. The Plaintiff showed both at the *Spears* hearing and in his response to the motion for summary judgment that the confiscation of the religious property placed a substantial burden on his ability to practice his religion. He testified that he could not say his prayers without his prayer rug and beads. He could not study his Koran. The confiscation of these items took away the very items he needed to practice his religion. The Defendants have not

shown that the confiscations did not place a substantial burden on the Plaintiff's ability to practice his religion. For summary judgment purposes, the Court must conclude that the confiscations placed a substantial burden on the Plaintiff's ability to practice his religion, thus Norman and Milligan must show that such confiscation furthered a compelling governmental interest and did so by the least restrictive means.

      The Defendants stated in the present motion that the claim is properly brought in state court as a conversion claim. They incorporated their arguments regarding the Plaintiff's First Amendment claims in arguing that their actions were within policy and furthered a compelling governmental interest of making sure that inmate property was properly possessed, stored and used. They admitted that the Plaintiff had been previously allowed to keep his prayer rug despite the fact that he did not have property papers, but they added that this did not make the confiscation improper. They noted that if the warden had decided to permit the Plaintiff to keep the prayer rug, then it shows that it had been previously confiscated. They argued that the Beto Unit administration could have chosen to return the rug, but they did not do so in response to his grievances. They argued that they were not bound by the decision of another warden. They argued that the Plaintiff did not have property papers and policy authorized them to confiscate it. They argued that their actions were reasonable.

      With respect to the Defendants argument that the confiscations furthered a compelling governmental interest for the same reasons they identified in their discussion of the Plaintiff's First Amendment claim, the Court must conclude that there are problems with their argument for the same reasons identified by the Court in the discussion of the Plaintiff's First Amendment claims. The motion for summary judgment with respect to the RLUIPA claim must also be denied because the Defendants failed to show that the confiscations furthered a compelling governmental interest by the least restrictive means. Just like the situation in *Mayfield*, they have made no attempt to show that their application of the policy was narrowly tailored. It is again noted that confiscating and destroying the Plaintiff's prayer beads because he wore them around his neck was not the least restrictive means of dealing with the problem. A disciplinary case would have sufficed.

Furthermore, confiscating and destroying the prayer rug and Koran was not the least restrictive means of responding to the problems with the prayer rug and Koran. The Defendants have not shown that they are entitled to summary judgment with respect to the RLUIPA claim.

It is again noted that the Defendants argued that this is a simple state court claim of conversion. Even if the Plaintiff's religious claims lacked merit, his claims about property being confiscated pursuant to policy still raises due process claims. *See Allen v. Thomas*, 388 F.3d 147 (5th Cir. 2004). Their effort to downplay the significance of the confiscations is misplaced.

This brings us back to the qualified immunity argument. The Plaintiff has arguably shown a violation of his rights under the First Amendment and RLUIPA. Defendants Norman and Milligan have not shown that there were no violations of his rights under the First Amendment and RLUIPA. With respect to the second prong in the qualified immunity analysis, the undisputed competent summary judgment evidence does not show that Norman and Milligan's conduct was objectively reasonable under existing clearly established law. Indeed, the Court could foresee a reasonable jury finding that the confiscations on June 29, 2006, were the product of the Defendants being angry at the Petitioner for being slow, as opposed to any legitimate security concerns. The facts underlying the decision of whether the Defendant's actions were objectively reasonable must be decided by the trier of fact. Summary judgment may not be granted based on the defense of qualified immunity. It is therefore

**ORDERED** that the Defendants' amended motion for summary judgment (docket entry #57) is **DENIED**.

**So ORDERED and SIGNED this 19th day of December, 2008.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE